**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBIN ANTHONY MORAN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14 C 1634** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Robin Anthony Moran seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now grants Defendant's motion, denies Plaintiff's motion, and affirms the denial of benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on May 26, 2011, alleging that he became disabled on or about November 25, 2010 due to heart disease (for which he had a triple-bypass surgery, valve replacement, and a defibrillator implant) and hypertension. (R. 15-16; 42; 135). He also alleges that he experiences dizziness, a racing heart, being "out of wind," stress, and depression, all of which limit his ability to work. (R. 135; 165). The Social Security Administration denied his application initially on August 25, 2011, and again upon reconsideration on October 24, 2011. (R. 42-43). Plaintiff filed a timely request

for hearing and appeared before Administrative Law Judge Lovert F. Bassett (the "ALJ") on August 15, 2012. (R. 13). The ALJ heard testimony from Plaintiff, who was represented by counsel, and medical expert Ashok Jilhewar, M.D. (the "ME"). Shortly thereafter, on September 20, 2012, the ALJ found that Plaintiff can perform the full range of sedentary work, and thus he is not disabled since there are a significant number of jobs in the national economy that he can do. (R. 47-56).

In support of his request for remand, Plaintiff argues that the ALJ erred by (1) failing to fully address whether his impairments met or medically equaled Listing 4.02 for disability due to chronic heart failure; (2) failing to provide a narrative discussion of his functional capabilities, consider his impairments in combination, and assess him with any mental limitations in determining his residual functional capacity ("RFC"); (3) failing to sufficiently explain and provide supporting evidence for his credibility finding; and (4) improperly applying the medical-vocational grids ("grids") at Step Five to find him not disabled. As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and there is no basis for remanding the case.

## FACTUAL BACKGROUND

Plaintiff is currently 49 years old, and was 46 years old at the time of the ALJ's decision. (R. 42). He lives with his mother and teenaged son. (R. 17; 174). He is a high school graduate who worked from 1992 until 2000 as a laborer doing site maintenance at a mall. (R. 16; 140). He then worked for several years at various jobs, including as an asphalt paving truck driver, cement truck driver, and machine operator. (*Id.*). He was laid off from his last position in May 2008, and has not worked since. (R. 135). He alleges that his health has prevented him from performing the jobs he used to

do after undergoing heart surgeries in late November and early December 2010. (R. 15-17; 140).

## A. Medical History

### 1. November 2010 through December 2010

Plaintiff's earliest medical records are from his November 25, 2010 to December 18, 2010 hospitalization, during which he underwent his heart surgeries. (R. 219-242). He had felt fatigued for about a month prior to this hospitalization, and suffered severe attacks of shortness of breath and coughing for about three or four days at the end of that month, which caused his family to bring him to the emergency room at Sherman Hospital. (R. 237). Plaintiff was admitted on November 25, 2010 and immediately underwent a chest x-ray, which revealed signs of congestive heart failure.[1] (R. 238). He was then seen by cardiologist Syed Hasan, M.D., who prescribed IV fluids to stabilize his condition and recommended he undergo an echocardiograph that same day.[2] (*Id.*). The echocardiograph revealed severe aortic valve stenosis with severe regurgitation; ejection fraction of about 25% in the left ventricle of the heart, which the cardiologist considered poor; and moderate pulmonary hypertension.[3] These findings

---

[1]    "Congestive heart failure" is "[a] condition in which the heart cannot pump enough blood to supply the body's tissues with sufficient oxygen and nutrients; back up of blood in vessels and the lungs causes buildup of fluid (congestion) in the tissues." http://medical-dictionary.thefreedictionary.com/congestive+heart+failure (all websites in this opinion last visited July 6, 2015).

[2]    An "echocardiograph" is "an instrument using reflected ultrasonic waves to show the structures and functioning of the heart for diagnosing heart abnormalities." http://www.thefreedictionary.com/echocardiograph.

[3]    "Aortic stenosis" is "[a] stiffening of the artery which carries blood from the heart to the body." http://medical-dictionary.thefreedictionary.com/aortic+stenosis. "Valvular regurgitation" means "backflow of blood through the orifices of the heart valves due to imperfect closing of the valves." http://medical-dictionary.thefreedictionary.com/regurgitation. The "left

were then confirmed with a cardiac catheterization test. [4]  Upon evaluating these diagnostic testing results, Dr. Hasan concluded Plaintiff would likely need an aortic valve replacement, so he asked a heart surgeon at Sherman, Joong H. Choh, M.D., to consult.  (R. 238-39).

The next day, on November 26, 2010, Dr. Choh interviewed and examined Plaintiff, as well as reviewed the results from the tests ordered by Dr. Hasan.  (R. 237-42).  Plaintiff explained to the heart surgeon that he knew he had a heart problem for many years, as he was told when applying for the Marines that he had a heart murmur and possible issues with his heart valves.  (R. 237).  Also, a few years prior to this hospitalization, a different doctor told him that he had a heart valve disorder.  (*Id.*).  Plaintiff also told Dr. Choh that he had been smoking a half a pack to a pack of cigarettes per day all his life and drank a couple of beers daily, but he had not been smoking in the past month.  (R. 239).

Upon examination, Plaintiff appeared fatigued, showed shortness of breath when resting and exerting himself, had a cough with frothy mucus, and had a loud heart murmur.  (R. 239-40).  The heart surgeon also noted that Plaintiff's lung sounds were

---

ventricle" is "the chamber on the left side of the heart that receives arterial blood from the left atrium and pumps it into the aorta."  http://www.thefreedictionary.com/left+ventricle.  Ejection fraction refers to "[t]he fraction of all blood in the ventricle that is ejected at each heartbeat" and a normal ejection fraction in the left ventricle is 65%.  http://medical-dictionary.thefreedictionary.com/ejection+fraction.  "Pulmonary hypertension" is "a rare lung disorder characterized by increased pressure in the pulmonary artery."  http://medical-dictionary.thefreedictionary.com/pulmonary+hypertension.

[4]  "Cardiac catheterization" is "a diagnostic procedure which does a comprehensive examination of how the heart and its blood vessels function. One or more catheters is inserted through a peripheral blood vessel in the arm (antecubital artery or vein) or leg (femoral artery or vein) with x-ray guidance. This procedure gathers information such as adequacy of blood supply through the coronary arteries, blood pressures, blood flow throughout chambers of the heart, collection of blood samples, and x-rays of the heart's ventricles or arteries."  http://medical-dictionary.thefreedictionary.com/Cardiac+catheterization.

clear, his examination was otherwise unremarkable, and at about 178 pounds and 6 feet tall, his weight was normal. (*Id.*). Dr. Choh determined Plaintiff's heart failure episode was improving while he was in the hospital, but concluded that his "main problem is severe aortic valve pathology" that had been ongoing for many years and had "developed into a state of cardiomyopathy and congestive heart failure[.]"[5] (R. 240-41). Although there was a high risk of complications or death from the surgery due to Plaintiff's condition, Dr. Choh recommended aortic valve replacement as soon as possible because his prognosis was "rather dismal" without the surgery. (R. 241-42).

On December 1, 2010, Dr. Choh operated on Plaintiff's heart, performing several surgical procedures, including an aortic valve replacement; a triple coronary bypass; the insertion of an intra-aortic balloon pump to help the heart pump blood during Plaintiff's recovery; and the insertion of various tubes and wires.[6] (R. 229-36). Plaintiff was then transferred to the cardiac unit for observation, with "fairly stable" vital signs. (R. 236). At first, he had "a difficult postoperative course" in the hospital, with complications including "runs of ventricular tachycardia."[7] (R. 219). On December 8, 2010, he required an electric shock to correct his abnormal heart rhythm. (*Id.*).

_____

[5]    "Cardiomyopathy" is "a chronic disease of the heart muscle (myocardium), in which the muscle is abnormally enlarged, thickened, and/or stiffened. The weakened heart loses the ability to pump blood effectively, resulting in irregular heartbeats (arrhythmias) and possibly even heart failure." http://medical-dictionary.thefreedictionary.com/Cardiomyopathy.

[6]    A "coronary bypass" is "the surgical bypass of a narrowed or blocked coronary artery by grafting a section of a healthy blood vessel taken from another part of the patient's body." http://www.thefreedictionary.com/coronary+bypass.

[7]    "Tachycardia" means "[a] rapid heart rate, especially one above 100 beats per minute in an adult." http://www.thefreedictionary.com/ventricular+tachycardia.

About a week later, on December 14, 2010, the surgeon implanted a defibrillator in Plaintiff's heart to treat his tachycardia, and he had no complications from that surgery.[8] (R. 219-20). He did, however, complain of feeling anxious before and after the surgery, and was treated with some sedatives by Dr. Hasan. (R. 313). By December 18, 2010, Plaintiff had generally recovered from the surgeries, with no complaints other than some discomfort in the area of his surgical incisions, and was accordingly discharged from Sherman that day. (*Id.*).

### 2. January 2011 – June 2011

On January 5, 2011, Plaintiff saw his heart surgeon, Dr. Choh, for a follow-up on his post-operative condition. (R. 229-30). Dr. Choh wrote that Plaintiff was "doing well" and was maintaining an "excellent general condition" including "ambulating well without any shortness of breath." (R. 229). His incisions were all well-healed, lungs were clear, and heart sounds were regular. (*Id.*). He was taking pain medications, potassium, and Coumadin, a blood thinner, and was undergoing regular International Normalized Ratio ("INR") testing to monitor the effects of the Coumadin. (R. 229-30). Although Plaintiff's medications required some adjustments based on his recent INR testing results, he was instructed to continue them and the surgeon found he had reached a "satisfactory therapeutic range." (R. 230). Dr. Choh recommended a follow-up in six to eight weeks. (R. 230).

A couple of weeks later, on January 20, 2011, Plaintiff also followed up with his cardiologist at Sherman, Dr. Hasan. (R. 537). He reported doing well with no

---

[8] A "defibrillator" is "[a]n electrical device used to counteract fibrillation of the heart muscle and restore normal heartbeat by applying a brief electric shock." http://www.thefreedictionary.com/defibrillator.

complaints, and the cardiologist noted no abnormalities in his examination.  (*Id.*).  Dr. Hasan wrote in his treatment notes that Plaintiff's condition, including his cardiomyopathy, was "stable" and he recommended a follow-up in three months. (*Id.*).  A few days later, on February 1, 2011, Plaintiff also saw his internist at Sherman, Edwin B. Soriano, M.D.  (R. 260, 262-63).  He reported that he was "generally feel[ing] better since his heart surgery" and the internist noted no examination abnormalities other than a "slight murmur" in his heart and anemia that was "likely from post op [sic] recovery." (*Id.*).

On February 13, 2011, Plaintiff was in a car accident, and although he was not injured, he felt "extremely emotionally upset and angry."  (R. 283).  He took a Xanax to try and calm down, but had persistent anxiety and stress the rest of the day.  (R. 280).  Due to his anxiety and his concern that his heart could be affected, he went to the emergency room at Sherman the next day, February 14, 2011.  (*Id.*).  His initial blood tests in the emergency room showed a troponin leak, and so he was admitted for further care.[9]  (*Id.*).

The day after Plaintiff was admitted, on February 15, 2011, he was examined by Dr. Soriano, who found he was no longer in any acute distress and that his anxiety was caused by "a stressor event."  (R. 280-82).  The internist also noted Plaintiff had high blood pressure that required medications, and recommended Plaintiff continue his other medications and have a consultation with Dr. Hasan.  (R. 282).  Dr. Hasan saw Plaintiff

---

[9]     "Troponins" are "specific proteins found in [the] heart muscle. . . . When [the] heart muscle is damaged, as in a myocardial infarction (MI), troponins leak out of cells and into the bloodstream. Increased troponin levels indicate myocardial infarction or injury in a person with chest pain or pressure. Some MIs are silent, manifesting few if any symptoms." http://medical-dictionary.thefreedictionary.com/Troponins+Test.

that same day, and noted he had been doing well prior to the accident.  (R. 283).  The cardiologist also noted Plaintiff was "somewhat" short of breath after the accident, but "this was apparently due to hyperventilating from the anxiety."  (*Id.*).  Plaintiff denied any problems and said he felt "very well physically" but was "very emotionally upset after this accident."  (*Id.*).  Dr. Hasan found no abnormalities in Plaintiff's examination and noted that his lab results were normal except for "mildly elevated" troponin levels.  (R. 284-85).  The cardiologist assessed Plaintiff with an anxiety attack but stated he did "not believe that his current symptoms represent any sort of heart failure or true angina."[10] (R. 285).

Regarding the troponin leak, Dr. Hasan thought it was likely explained by a blockage in one of the grafts performed in the triple bypass surgery.  (*Id.*).  He concluded that "currently there is nothing mechanically that can be done for him, but fortunately he is otherwise asymptomatic."  (R. 286).  Dr. Hasan recommended an echocardiograph, but discharged Plaintiff from the hospital and requested that he come back for a follow-up in one or two weeks.  (*Id.*).  Plaintiff's February 16, 2011 echocardiograph was normal and "without evidence of insufficiency" in his aortic valve, but did show his "[o]verall ejection fraction [was] diminished at 45%."  (R. 287-88).

On February 22, 2011, Plaintiff went for his follow-up with Dr. Hasan, but was instead seen by a colleague, cardiologist Pradeep M. Maheshwari, M.D.  (R. 517).  Plaintiff denied any symptoms or problems, and stated that he felt better.  (*Id.*).  Upon examination, Dr. Maheshwari found Plaintiff's defibrillator was functioning normally and

---

[10]     "Angina" is "pain, 'discomfort,' or pressure localized in the chest that is caused by an insufficient supply of blood (ischemia) to the heart muscle."  http://medical-dictionary.thefreedictionary.com/angina.

he had no arrhythmia events, his lungs were clear, and he had no edema.[11] (*Id.*). The cardiologist recommended a follow-up in about three months. (*Id.*).

At a March 3, 2011 follow-up with Dr. Soriano, Plaintiff reported generally feeling well, except for some leg pain near his surgical scars where veins were taken for use in his bypass surgery. (R. 259). The doctor recommended ibuprofen and a cold compress. (*Id.*). Some weeks later, on April 21, 2011, Plaintiff had a follow-up with Dr. Hasan, who found he had no symptoms from his conditions. (R. 536). His pulse was normal, respirations were normal and unlabored, breathing was clear, heart rhythm was normal, and heart sounds were normal, other than a heart murmur. Plaintiff also reported feeling like he was "doing remarkably well." (R. 477). The cardiologist did note that Plaintiff now weighed 206 pounds, giving him a BMI of 28, in the overweight range. (*Id.*). Overall, he found Plaintiff's cardiomyopathy manifested no heart failure symptoms, he had no reoccurrences of tachycardia, and his blood pressure medication was decreased due to good results. (*Id.*). The cardiologist recommended Plaintiff continue his current medications and return in three months. (*Id.*).

On May 11, 2011, Plaintiff had a follow-up with Dr. Soriano, and reported he generally felt well other than some occasional heartburn. (*Id.*). The internist recommended Plaintiff avoid triggering foods and prescribed Prevacid, as well as recommended exercise due to signs of high cholesterol in his recent laboratory results. (*Id.*). A couple of weeks later, on May 26, 2011, Plaintiff applied for disability benefits. (R. 42).

---

[11]     "Edema" is "a condition of abnormally large fluid volume in the circulatory system or in tissues between the body's cells (interstitial spaces)." http://medical-dictionary.thefreedictionary.com/Edema.

### 3. July 2011 through August 2011

On July 28, 2011, Plaintiff had a follow-up with Dr. Soriano, with complaints of soreness near his defibrillator site and near his sternal surgical wound. (R. 475). He also complained he was easily fatigued, and very anxious and emotional such that he needed "frequent reassurance about his condition." (*Id.*). On the other hand, he denied chest discomfort suggestive of any blood flow problems, angina, shortness of breath, palpitations, stroke-like symptoms, symptoms of valvular heart disease, or any other problems. (*Id.*). Dr. Soriano also found Plaintiff's examination was normal, his wounds were healed, his mood was appropriate, but he was still overweight. (R. 476). The internist prescribed Xanax for Plaintiff's feelings of anxiousness but did not yet add an anxiety diagnosis to his file, and told him to follow-up with Drs. Hasan and Maheshwari. (*Id.*).

On August 9, 2011, Plaintiff had a consultative examination by Roopa Karri, M.D., to evaluate his disability claim. (R. 480-83). Dr. Karri reviewed Plaintiff's records, interviewed him, and conducted an examination. (R. 480). Plaintiff stated he had a history of hypertension and hyperlipidemia, and discussed his hospitalization and surgeries in November and December 2010. (*Id.*). He said he still gets shortness of breath despite the surgeries. (*Id.*). He also stated that he has chest wall pain near his left nipple, his feet hurt and swell occasionally, and his hands go numb occasionally at night. (R. 480-82). Dr. Karri noted Plaintiff was taking various medications including for high blood pressure, high cholesterol, and blood thinning, and that he cried and became emotional when discussing his condition. (R. 481). She further noted upon examination that Plaintiff's blood pressure was just above normal; he was anxious; he weighed 215

pounds; he had something protruding that seemed like a wire from his sternal sutures where his surgical incision was made; and his range of motion in the left shoulder was slightly reduced. (R. 481-82). He was otherwise normal, including that his lungs were clear; he had normal strength; he could ambulate without support; his mental status was alert and oriented with a good memory and ability to do calculations; and his effort and cooperation were excellent. (*Id.*). Dr. Karri's impression was a history of hypertension and hyperlipidemia that were "under control," a history of aortic valve replacement and current use of a blood thinner, and a history of triple bypass surgery and defibrillator implantation with current left chest wall pain. (R. 483).

Consulting psychologist David Voss, Ph.D., prepared a Psychiatric Review Technique for evaluating Plaintiff's disability claim, dated August 20, 2011. (R. 492-505). Dr. Voss found Plaintiff had no medically determinable mental impairment based on his review of the record, including Dr. Karri's consultative examination report and Plaintiff's disability reports. (*Id.*). He noted that although Plaintiff was anxious and cried during Dr. Karri's examination, he attributed his limitations to physical rather than mental impairments. (R. 504). Dr. Voss also noted that there were no medical statements or opinions in the record from a treating mental health professional. (*Id.*).

Consulting physician Calixto Aquino, M.D., prepared a Physical Residual Functional Capacity Assessment for evaluating Plaintiff's disability claim, dated August 23, 2011. (R. 506-13). Dr. Aquino found Plaintiff capable of light work, but only occasional climbing of ladders, ropes and scaffolds. (R. 507-08). Dr. Aquino explained that his finding was based on Plaintiff's records showing a denial of post-surgery symptoms except for some pain near his defibrillator, and the most current examination

showing some chest wall pain, above-normal blood pressure, and something protruding from his chest. (R. 507). The doctor further explained that although Plaintiff complains of shortness of breath, he had no current signs of lung complications, and there was no objective evidence of any musculoskeletal complaints. (R. 508, 511). On the other hand, the doctor determined that Plaintiff's impairments could cause restrictions with activities such as significant, heavy lifting and prolonged climbing. (R. 511). Shortly after these reports were prepared, on August 25, 2011, the agency denied Plaintiff's application for disability benefits. (R. 42).

On August 30, 2011, Plaintiff followed-up with the cardiologist Dr. Maheshwari. (R. 531) He complained of pain in his feet that he said he had felt since the heart surgery, when veins were taken from his legs. (*Id.*). He also complained of pain in his left nipple area that he said he had felt since the defibrillator implant. (*Id.*). Dr. Maheshwari evaluated the defibrillator device and found it was functioning normally and Plaintiff denied any shocks from it. (*Id.*). The cardiologist also examined Plaintiff and found his lungs were clear and he had no edema. (*Id.*). He recommended a follow-up in three months. (*Id.*).

Dr. Maheshwari wrote a letter to Dr. Hasan the same day of his examination, detailing his findings regarding Plaintiff in more detail than in his treatment notes. (R. 519). He wrote that Plaintiff was "very emotional" but had no other complaints and a normal examination. (*Id.*). He noted that since Plaintiff's surgeries and hospitalization, he has "done OK and EF [ejection fraction] has improved." (*Id.*). He also wrote that his testing of Plaintiff's defibrillator showed two episodes of non-sustained tachycardia, but he was asymptomatic. (*Id.*). He did find an infection in Plaintiff's left toe and

recommended treatment with antibiotics, but otherwise suggested he continue his regular treatments. (*Id.*).

### 3. September 2011 through December 2011

On or about September 19, 2011, Plaintiff updated his disability application to add additional allegations of being unable to work due to feeling stressed out, having trouble focusing, and being depressed. (R. 532). By October 21, 2011, consulting physician Charles Kenney, M.D. and consulting psychologist John Tomassetti, Ph.D. had prepared an assessment form for evaluating Plaintiff's disability claim on reconsideration. (R. 544-46). They jointly recommended affirming the previous consultants' findings that Plaintiff is capable of light work but only occasional climbing of ladders, ropes and scaffolds. (R. 546). The consultants explained that they considered Plaintiff's additional allegations along with his initial application materials, as well as the entire record, including evidence submitted since the initial denial. (*Id.*). They noted, and explained with examples, that Plaintiff's most recent physical examinations revealed "no significant changes from prior medical evidence" which supported affirming the previous findings. (*Id.*). Three days later, on October 24, 2011, Plaintiff's disability benefits application was again denied. (R. 43).

On October 27, 2011, Plaintiff visited Dr. Hasan, complaining of trouble breathing "even with light activity" and feeling very fatigued, and he appeared extremely distressed and anxious. (R. 547). He denied any other symptoms, including chest discomfort or palpitations, and stated that his defibrillator had not fired since his last visit. (*Id.*). Other than some trouble breathing and weight gain to 223 pounds, his examination was normal and unchanged from before. (R. 547-48). The doctor ordered

a chest x-ray, blood work, and an echocardiograph to further assess Plaintiff's condition. (*Id.*). The testing results from these diagnostic procedures are not in the record.

The same day of the examination, Dr. Hasan filled out two reports in support of Plaintiff's disability claim, at the request of his counsel. The first is a Medical Evaluation Physician's Report, in which the cardiologist indicated that he had treated Plaintiff since November 26, 2010, and had seen him every two or three months since. (R. 550). Dr. Hasan wrote that Plaintiff's diagnoses were cardiomyopathy and aortic stenosis, he had a "fair" response to his treatments, and his mental status was "anxious but otherwise normal." (R. 550-53). Dr. Hasan also wrote that Plaintiff's ejection fraction was 20% in December 2010 and indicated his AHA Cardiac Functional Capacity was Class III.[12] (R. 551). He noted in boxes on the form that Plaintiff can lift no more than ten pounds; has a more than 50% reduced capacity in walking, bending, standing, stooping, pushing, pulling, and travel by public conveyance due to his physical ailments; and has mild limitations in performing his activities of daily living, social functioning, and maintaining concentration, persistence, and pace. (R. 553).

The second form Dr. Hasan completed on October 27, 2011 is a Cardiomyopathies Treating Physician Data Sheet. (R. 554-59). In that form, the cardiologist indicated Plaintiff has cardiomyopathy that is being treated with medications and had been treated with surgery, and that he has shown "[m]ild improvement." (R. 554-56). Dr. Hasan also wrote that Plaintiff can only stand or walk for one to two hours

---

[12]    Class III AHA Cardiac Functional Capacity indicates "[o]bjective evidence of moderately severe cardiovascular disease" and is applied to "[p]atients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea, or anginal pain." http://my.americanheart.org/professional/StatementsGuidelines/ByPublicationDate/PreviousYears/Classification-of-Functional-Capacity-and-Objective-Assessment_UCM_423811_Article.jsp.

with normal breaks in an eight hour work day, and should avoid all exposure to extreme cold, extreme heat, and dust or fumes. (R. 556-57).

On November 30, 2011, Plaintiff visited Dr. Maheshwari for a follow-up. (R. 563). Plaintiff complained of shortness of breath when he "pushes himself and is not listening when his body tells him to rest." (*Id.*). He also said he felt anxious "from time to time" but takes a Xanax when this happens and "is able to rest." (*Id.*). His examination was normal, and Dr. Maheshwari found his defibrillator was functioning normally. (*Id.*). The cardiologist recommended a routine follow-up in three months. (*Id.*).

### 4. January 2012 through May 2012

According to undated notes that appear to be from early 2012, Plaintiff visited his internist, Dr. Soriano, and complained of feet pain. (R. 579). Dr. Soriano noted no problems in his examination, but recommended a Doppler ultrasound to investigate the blood flow and functioning of Plaintiff's leg veins. (*Id.*). On February 28, 2012, Plaintiff underwent the recommended ultrasound, and the results were normal. (R. 561). A few days later, on March 5, 2012, Plaintiff visited Dr. Soriano again, complaining of cramping in the left thigh and feeling thirsty, but he denied chest pain and shortness of breath. (R. 578). Dr. Soriano thought Plaintiff's leg pain and cramping could be a side-effect of his blood pressure medication, and he found that Plaintiff's recent lab work indicated he could stop taking potassium and his blood pressure medication, so he discontinued both medications. (*Id.*). (R. 562; 578).

On March 14, 2012, Plaintiff went for a follow-up with his cardiologist Dr. Maheshwari, but was instead evaluated by a nurse. (R. 560). Plaintiff complained of problems sleeping due to anxiety, and of an episode of dizziness and blurry vision.

(*Id.*). The nurse did not find any episodes of arrhythmia or tachycardia correlating with his complaints based on the data she gathered from the defibrillator. (*Id.*). She further found the device was functioning normally. (*Id.*). Plaintiff also told the nurse he was only taking half his prescribed dose of Coumadin, and she encouraged him to take his full dose. (*Id.*). She scheduled him to see Dr. Maheshwari at his next regular follow-up. (*Id.*).

Plaintiff followed up with Dr. Soriano on April 2, 2012, and complained that he had been feeling increasingly anxious because he thought his heart went "out of rhythm," he felt dizzy, was short of breath, and lost vision in his left eye at times. (R. 577). The doctor's examination was normal, so he recommended Plaintiff continue his current medications, see his cardiologist, and take a Xanax when he felt anxious. (*Id.*). Plaintiff attempted to see Dr. Maheshwari on June 1, 2012, but instead was evaluated by another nurse. (R. 564). This nurse noted three non-sustained tachycardia events according to the defibrillator data, but none lasted longer than five seconds and so the device was not required to provide any shocks to Plaintiff to treat him. (*Id.*). Plaintiff complained of dizziness and that he was "afraid to do anything, because he feels his heart racing." (*Id.*). The nurse found no abnormalities in Plaintiff's examination, but noted he appeared anxious, so she recommended an expedited follow-up with Dr. Maheshwari in two weeks. (*Id.*).

### 5. June 2012 through September 2012

Dr. Hasan filled-out an updated Medical Evaluation Physician's Report on June 7, 2012 to support Plaintiff's disability claim. (R. 565-68). The cardiologist wrote that he had examined Plaintiff that day, but there are no notes or reports concerning this

examination in the record. (R. 565). Dr. Hasan also wrote that he had seen Plaintiff about every three to four months, but there are no notes in the record concerning any such visits since his October 27, 2011 examination, over seven months prior.

Dr. Hasan explained that Plaintiff had a normal blood pressure at his June 2012 examination, and that testing conducted on November 25, 2011 (which is not in the record) showed his ejection fraction was up to 60-65%. (*Id.*). The cardiologist also wrote that Plaintiff has "difficulty" with balance and his gait. (R. 567). In contrast with his October 27, 2011 responses, Dr. Hasan indicated on this form that Plaintiff's anxiety causes extreme (rather than mild) limitations in his ability to perform activities of daily living, social functioning, and in maintaining concentration, persistence, and pace. (*Id.*). The cardiologist also indicated that Plaintiff had three episodes of decompensation in the prior twelve months (he had reported zero episodes in his October 27, 2011 responses). (R. 568). Dr. Hasan also responded in this current form that Plaintiff's physical ailments result in a more than 50% reduced capacity in sitting, turning, climbing, speaking, fine manipulation, and in his ability to perform activities of daily living, in addition to the reduced capacities he had previously indicated in walking, bending, standing, stooping, pushing, pulling, and traveling by a public conveyance. (*Id.*).

On June 15, 2012, Plaintiff was evaluated by Dr. Maheshwari, who wrote a letter to Dr. Hasan detailing his findings. (R. 569-70). Dr. Maheshwari wrote that Plaintiff complained of anxiety, pain in the legs and chest, and shortness of breath, but he was "stable arrhythmia-wise" as he had only some non-sustained tachycardia. (R. 569). Dr. Maheshwari also found Plaintiff had "[a]nxiety with a lot of somatic complaints" and as a

result he referred him to a psychiatrist, Dr. Syed H. Anwar, for evaluation. (*Id.*). Otherwise, he recommended no changes in Plaintiff's treatment. (*Id.*).

Dr. Anwar filled-out a Medical Evaluation Physician's Report on July 21, 2012 in support of Plaintiff's disability claim. (R. 576). It does not appear the entire report is in the file, but the page with Dr. Anwar's signature gives the same findings that Dr. Hasan gave in his June 7, 2012 report, including findings of extreme mental limitations and three episodes of decompensation in the past twelve months. (*Id.*). There are no treatment notes in the record from Dr. Anwar through the date of this report. On August 15, 2012, about a month after Dr. Anwar filled-out his report, Plaintiff appeared at the hearing before the ALJ and testified, among other things, that he was going to be undergoing a stress test in the near future. (R. 26).

On September 4, 2012, Plaintiff underwent an echocardiograph and stress test that were both ordered by Dr. Hasan. (R. 584-90). The echocardiograph indicated that Plaintiff's aortic valve was functioning normally and he had an ejection fraction of 55%. (R. 585). However, he was only able to exercise on the treadmill for the stress test for one minute and thirty seconds before the test had to be discontinued due to his complaints of tingling in the legs and shortness of breath. (R. 583; 589). Dr. Hasan's report from the stress test explains that there were no abnormalities noted during the examination, but because of the short duration of the test the results were inconclusive. (R. 589-90.). Dr. Hasan noted that Plaintiff showed a very poor exercise capacity for a person of his age, and that he was "extremely deconditioned and in poor shape." (R. 590). Plaintiff refused any medication for his leg tingling. (R. 587).

On September 4, 2012, Dr. Anwar, the psychiatrist, wrote a letter addressed "To Whom It May Concern" regarding Plaintiff's condition, indicating he had been treating him since July 21, 2012, had seen him again on September 1, 2012, and was planning on a follow-up in October. (R. 581.). Dr. Anwar also explained that he had diagnosed Plaintiff with depressive disorder and rated him a GAF score of 40.[13] There are no corresponding treatment notes or examination reports from Dr. Anwar. On September 6, 2012, Dr. Soriano wrote a note on his prescription pad stating that Plaintiff has "ongoing intermittent shortness of breath" and "peripheral edema ankles [sic] due to his cardiomyopathy." (R. 580). As with Dr. Anwar's letter, there are no notes or examination reports explaining Dr. Soriano's prescription pad notation.

Dr. Hasan also wrote a letter and prescription note on September 6, 2012 concerning Plaintiff, each describing Plaintiff's medical history of heart disease and aortic valve replacement. (R. 582-83). They both also state that Plaintiff was only able to exercise for one minute and thirty seconds on the stress test, when it then had to be discontinued due to his complaints of leg pain and difficulty breathing. (*Id.*). Both the letter and note conclude that Plaintiff has "very poor" functional capacity. (*Id.*). The note and letter are the final portions of the medical record.

**B.    Administrative Law Judge's Decision**

The ALJ found that Plaintiff's cardiomyopathy (with his corresponding surgical history) and obesity are severe impairments, and his depressive disorder and

---

[13]    The GAF score is a numeric scale of 0 through 100 that was used to assess the severity of symptoms and functional level by the American Psychiatric Association. *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. text revision 2000). It has recently been discontinued, but was in use at the time of Dr. Anwar's letter. *See id.* at 16 (5th ed. 2013). A score of 40 is given to an individual with "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas." *Id.* at 34.

complaints of anxiety are non-severe impairments.  (R. 49-50).  Relying on the medical evidence and the opinion of the ME, the ALJ then found that Plaintiff's impairments, alone or in combination, do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 50).  The ALJ next reviewed Plaintiff's testimony and the medical records and determined that he has the capacity to perform the full range of sedentary work.  (R. 50).  In reaching this conclusion, the ALJ gave greater weight to testimony from the ME at the hearing that Plaintiff is capable of the full range of sedentary work than the opinions of Dr. Hasan and Dr. Anwar that Plaintiff is capable of less than sedentary work.  (R. 53-55).

With respect to Plaintiff's testimony, the ALJ noted that he alleged significant symptoms and limitations from his medical conditions, and that his presentation at the hearing indicated a greater degree of functional impairment than was shown in the medical evidence.  (R. 51, 54).  Nevertheless, he did not find Plaintiff's testimony and hearing presentation fully credible based on the record, including the objective medical evidence, his treatment history, and his own complaints and the medical findings in the progress notes and examination reports of record.  (R. 54).  Based on all of these findings and the stated RFC, the ALJ determined Plaintiff cannot perform his past work, but is capable of performing the full range of sedentary work, and thus can perform jobs that exist in significant numbers in the national economy.  (R. 55-56).  The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.  (R. 56).

## LEGAL STANDARDS

**A.**    **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g).  In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations."  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astru*e, 478 F.3d 836, 841 (7th Cir. 2007)).  This Court's task is instead to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [the] conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.**    **Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.  42 U.S.C. § 423(a)(1)(E); *Rapsin v.*

*Astrue*, No. 10 C 318, 2011 WL 3704227, at *5 (N.D. Ill. Aug. 22, 2011). A person is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.* In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**DISCUSSION**

**A.    Listing 4.02**

Plaintiff first argues that the ALJ erred in concluding that his impairments do not meet or equal Listing 4.02 for chronic heart failure by failing to fully consider the evidence of his impairments and relying on only part of the ME's opinion testimony. (Doc. 15, at 5-9; Doc. 24, at 1-2). The listings identify and describe impairments that the agency considers severe enough to prevent an individual from doing any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525(a). The claimant bears "the burden to present medical findings that match or equal in severity all the criteria specified by a listing." *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (citing *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *Ribaudo v. Barnhart,* 458 F.3d 580,

583 (7th Cir. 2006)).  Contrary to Plaintiff's argument, substantial evidence supports the ALJ's determination that his impairments do not meet or equal Listing 4.02.

To satisfy Listing 4.02, a claimant must present medically documented proof of heart failure despite following a regimen of prescribed treatment, which occurs during a period of stability and results in certain symptoms and limitations (which require their own proof).  20 C.F.R. Pt. 404, Subpt. P, Appendix I, § 4.02.  The heart failure criteria, found in paragraph A of that listing, can be shown through various types of medical evidence, but the only type at issue here is imaging evidence showing a claimant has an "ejection fraction of 30 percent or less."  20 C.F.R. Pt. 404, Subpt. P, Appendix I, § 4.02(A).  The ME testified that Dr. Hasan, Plaintiff's treating cardiologist, made some references to him having an ejection fraction of less than 30 percent, but there were no testing reports in the record showing these results during a period of stability.  (R. 20).  In fact, the ME noted that the only relevant echocardiograph results in the record at the time of the hearing were from February 16, 2011 and were "not good for the claimant's application because it . . . shows ejection fraction 45 percent [sic] [.]"  (R. 32).

In his listing analysis, the ALJ wrote that the ME found Plaintiff's impairments did not meet or equal any listing, including Listing 4.02, based on the objective medical evidence.  (R. 50).  The ALJ accepted and adopted this opinion, and specifically explained that Plaintiff did not satisfy the Listing 4.02 criteria because his "ejection fraction improved from 30 percent or less before his bypass surgery and AICD [defibrillator] placement to . . . 45 percent after his bypass surgery and AICD placement."  (R. 50).  Plaintiff's September 4, 2012 echocardiograph results submitted

to the ALJ after the hearing are also consistent with this finding, since that echocardiograph showed his ejection fraction was up to 55 percent.  (R. 585).

Plaintiff raises several unsuccessful challenges to the ALJ's reasoning.  His main argument is that the ME testified that if the results of his post-hearing stress test showed he was unable to exercise for at least five minutes on a treadmill, that would provide sufficient evidence to conclude that his impairments equaled Listing 4.02.  (Doc. 15, at 6-7).  He argues that since his September 4, 2012 stress test results indicate he was only able to exercise on the treadmill for one minute and thirty seconds, the ALJ erred by failing to evaluate whether this evidence, along with the ME's opinion, showed his impairments equaled that listing.  (*Id.* at 7).

In making this argument, Plaintiff cites various portions of the ME's testimony out of context, and in doing so appears to have misunderstood it.  The ME certainly testified that Plaintiff's treadmill stress test results would be relevant evidence to consider in evaluating his condition, including whether his impairments met some of the criteria of Listing 4.02.  (R. 27; 34).  And in fact, proof that a claimant is unable to perform a treadmill stress test to a certain capacity due to symptoms such as shortness of breath and fatigue would satisfy some of the Listing 4.02 criteria, specifically paragraph B of that listing.  20 C.F.R. Pt. 404, Subpt. P, Appendix I, § 4.02(B).  But the ME did not testify that being unable to perform the treadmill stress test for at least five minutes would show he satisfied all of the criteria of Listing 4.02, and had the ME done so, that would not have been accurate anyway.  Plaintiff's stress test results do not show that his ejection fraction levels satisfy the criteria of paragraph A of Listing 4.02, and he must show through medical evidence that he satisfies all of the listing criteria to qualify as

meeting or equaling that listing. *Sullivan*, 493 U.S. at 530. As the ALJ explained, Plaintiff has failed to do so here.

Plaintiff also briefly asserts that the ALJ erred by failing to consider all of his impairments in combination when determining whether his condition met or equaled a listing. (Doc. 15, at 8). He specifically states that his "[o]besity and anxiety, especially, should have been considered in this connection." (*Id.*). No analysis is provided for this assertion—Plaintiff does not identify which listing or listings his combined impairments meet or equal, or otherwise explain how his obesity, anxiety, and other impairments should have been factored into the ALJ's consideration. He simply states that a "proper equivalence inquiry may have led the ALJ to a different outcome." (*Id.*). This undeveloped argument is waived. *Carter v. Astrue*, 413 F. App'x 899, 906 (7th Cir. 2011). To the extent Plaintiff is arguing that his impairments in combination equal Listing 4.02, that argument would fail even if not waived, as the medical evidence does not show that he satisfies the criteria for that listing regardless of whether his other impairments are considered along with his cardiac condition.

Plaintiff also perfunctorily argues that the ME's opinion was just "one among others" and that the ALJ erred by failing to explain why the other opinions in the record were not given more weight than the ME's opinion. (Doc. 15, at 8-9; Doc. 24, at 2). He fails to specify which opinion or opinions the ALJ failed to properly evaluate, much less one demonstrating that his impairments met or equaled a listing. Nor does he give any reasons why any such opinions should have been given more weight than the ME's opinion. As a result, Plaintiff also waives this argument by failing to develop it. *Carter*, 413 F. App'x at 906.

To the extent Plaintiff is arguing that the ALJ failed to explain why Dr. Hasan's opinions that his cardiac disease met a listing were not given more weight than the ME's opinion, that argument also has no merit. The ALJ explained that he gave little weight to Dr. Hasan's opinions as set forth in his October 4, 2011 and June 7, 2012 reports because they were not supported by the cardiologist's own notes and were inconsistent with the objective medical evidence, including Plaintiff's echocardiograph testing results.[14] (R. 53-54). This explanation is supported by substantial evidence.

As explained by the ALJ, Dr. Hasan's treatment notes do not record medical signs and findings that support his opinions. (*Id.*). That cardiologist, like Plaintiff's other treating physicians, consistently reported normal examination findings and a lack of significant cardiovascular complaints or issues. (R. 52-54). Examples the ALJ cited include Dr. Hasan's February 15, 2011 notations that Plaintiff had an anxiety attack from his car accident and had a mild troponin leak, but was otherwise asymptomatic and had no signs of heart failure or angina; his April 21, 2011 notes that Plaintiff reported doing remarkably well and had no cardiovascular issues; his July 28, 2011 notes that Plaintiff was doing well from a cardiac standpoint, despite fatigue; and his October 27, 2011 notes discussing a lack of chest discomfort or palpitations. And the ALJ also correctly found that Plaintiff's echocardiograph testing results do not support any opinion that his heart condition meets or equals a listing, as explained above.

In sum, the ALJ's listing analysis in this case does not require remand.

---

[14] The ALJ mistakenly referred to Dr. Hasan's June 7, 2012 Physician's Report as dated May 8, 2012 (based on a pre-printed date on the form), but it is clear from the context that the ALJ analyzed the June 7 document.

**B.      RFC Determination**

Plaintiff next argues that the ALJ erred in determining his residual functional capacity ("RFC") by (1) failing to articulate a sufficient functional analysis of his RFC and identify the evidence in support; (2) failing to assess his impairments in combination; and (3) failing to include mental limitations in the RFC.  (Doc. 15, at 9-11; Doc. 24, at 3-4).  A claimant's RFC is the maximum work that he can perform despite any limitations, and is a legal decision rather than a medical one.  20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *7 n.8.  "When determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered 'severe.'"  *Craft*, 539 F.3d at 676.  None of Plaintiff's three arguments is meritorious.

**1.      Functional RFC Determination**

In his first argument, Plaintiff contends that the ALJ's decision does not contain a narrative discussion describing how the evidence supports his functional RFC determination, in contravention of the requirements of SSR 96-8p.  He admits that the ALJ is "not required to articulate . . . a function-by-function analysis" but nonetheless argues that the ALJ has not sufficiently articulated his findings and the evidence which supports them.  (Doc. 24, at 3).  SSR 96-8p requires that an ALJ's RFC assessment include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  1996 WL 374184, at *7.  Additionally, the ALJ must describe "the maximum amount of each work-related activity the individual can perform

based on the evidence available in the case record." *Id.* The ALJ has satisfied those requirements.

The ALJ explained in the decision that he found Plaintiff has "the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. 404.1567(a)." (R. 50). Claimants capable of sedentary work can lift no more than ten pounds at a time and can do jobs which involve walking and standing no more than about two hours in an eight hour workday. SSR 96-9p, 1996 WL 374185, at *3. The ALJ found no other limitations on Plaintiff's RFC. In support of this determination, the ALJ explained that Plaintiff alleged "significant and persistent symptoms of shortness of breath, palpitations, anxiety, swelling of the legs and dizziness/syncope" and also appeared significantly short of breath at the hearing. (R. 52). Despite Plaintiff's allegations and appearance, the ALJ found him capable of sedentary work because "the postoperative medical records do not reflect the level of severity he has alleged." (R. 52).

The decision contains a detailed summary of the medical evidence in support of this finding. As noted above, the ALJ discussed a number of findings from cardiologist Dr. Hasan that Plaintiff had a lack of significant heart issues and reported generally doing well after his surgeries. The ALJ also cited similar findings from Drs. Choh, Soriano and Maheshwari, as well as the consultative examiner. (R. 52-53). These findings include Dr. Choh's notes from a post-surgical follow-up in January 2011 that Plaintiff was generally doing well and had no shortness of breath; Dr. Soriano's notes from May 11, 2011 that Plaintiff generally felt well other than some heartburn; many findings from Dr. Maheshwari and his associates from August 2011 through June 2012

that Plaintiff had no sustained tachycardia or other heart or lung issues despite some occasional complaints of anxiety, shortness of breath, and some pain; and Dr. Voss's findings in his August 2011 consultative examination that Plaintiff's examination was largely normal despite his anxious appearance. (*Id.*). The ALJ also relied on Plaintiff's February 28, 2012 normal Doppler ultrasound results despite his complaints of leg pain, and the improved echocardiograph results noted above in this opinion. (*Id.*).

The ALJ also discussed that he accepted the ME's opinion that the objective medical evidence showed Plaintiff is capable of performing sedentary work, in contrast with the unsupported opinions of Dr. Hasan and Dr. Anwar that Plaintiff is not capable of such work. (R. 53-55). And the ALJ explained that he considered Plaintiff's testimony and his hearing presentation in determining the RFC. He discussed his finding that Plaintiff's testimony and "presentation at hearing" were not fully credible because they are inconsistent with the objective medical evidence, his routine and conservative treatment history, and the "essentially normal findings with no significant complaints of symptoms" in the progress notes and reports from his treating physicians and the consultative examiner. (R. 52-54).

Against this analysis and explanation, Plaintiff points to one line of the decision as evidence of error: the ALJ found his September 6, 2012 stress test results, in which he was able to exercise for one minute and thirty seconds, were "compatible with the performance of sedentary work." (R. 54). Plaintiff argues that the ME testified that his inability to finish at least five minutes of the stress test would be evidence that his impairments equaled Listing 4.02, not evidence that he could do sedentary work. (Doc. 15, at 9). Therefore, argues Plaintiff, by finding these test results compatible with an

RFC for sedentary work, the ALJ improperly substituted his lay judgment for a medical opinion. (*Id.*).

As this Court stated above, Plaintiff is not correct about the ME's testimony. Since the stress test was scheduled after the hearing, the ME explained to the ALJ how it would be done and what to look for in evaluating the results. The ME testified that the test would begin by obtaining Plaintiff's base line readings using an electrocardiogram while he was at rest, followed by exercising on the treadmill.[15] (R. 39). The ME then explained that the medical staff would track information about Plaintiff's condition during the testing, and abnormal results such as "ST depression" would cause the medical professionals to stop the test.[16] (*Id.*). The ALJ asked if ST depression is correlated with ischemia, and the ME confirmed this and explained that these "stress echo" results would provide a measure of congestive heart failure.[17] (*Id.*). Based on Plaintiff's presentation at the hearing, the ME expected his stress test would have to be terminated after less than five minutes of treadmill exercise, unless the ME had come to the "wrong" conclusion based on the hearing presentation, which he stated was "also possible." (R. 37; 40).

During Plaintiff's stress test, according to Dr. Hasan's report, there were no abnormalities, including "no significant ST or T-wave changes indicative of any

---

[15] An "electrocardiogram" is "a tracing representing the heart's electrical action derived by amplification of the minutely small electrical impulses normally generated by the heart." http://medical-dictionary.thefreedictionary.com/electrocardiogram.

[16] The "ST segment" is a line on an electrocardiogram. http://medical-dictionary.thefreedictionary.com/S-T+segment.

[17] "Ischemia" is "an insufficient supply of blood to an organ, usually due to a blocked artery" and is "an intermediate condition in coronary artery disease" which "can lead to a heart attack." http://medical-dictionary.thefreedictionary.com/ischemia.

ischemia" and no arrhythmia. (R. 583; 589). Rather, the test was terminated after one minute and thirty seconds due to Plaintiff's complaints of leg tingling and shortness of breath. (*Id*.). Plaintiff's stress test results did not show the medical signs of ischemia or congestive heart failure the ME testified would be present if his condition was consistent with his hearing presentation, and it was not terminated in less than five minutes for those reasons. The results were merely inconclusive, according to Dr. Hasan. (R. 590). As a result, the testing results and the ME's testimony do not support the Plaintiff's argument that the ALJ's RFC analysis contains a reversible error.

## 2. Impairments in Combination

Plaintiff also argues the ALJ erred in his RFC assessment by failing to consider his impairments in combination, and specifically contends that the ALJ failed to consider the impact of his cardiomyopathy, tachycardia/arrhythmia, aortic stenosis, diastolic dysfunction, anemia, troponin leak, and use of "powerful pharmaceuticals."[18] (Doc. 15, at 10). There is no such error in this case, as the ALJ's decision reflects a consideration of Plaintiff's impairments and symptoms, severe and non-severe, physical and mental, in combination. The ALJ described evidence he considered concerning Plaintiff's cardiomyopathy, complaints of anxiety, bouts of tachycardia, complaints of shortness of breath, use of medications, and his surgeries. (R. 51-54). As discussed above, in determining the RFC, the ALJ explained that he relied on Plaintiff's normal examinations, lack of symptoms, and good responses to his surgery and other

---

[18]     "Diastolic dysfunction" is "the decline in performance of one (usually the left ventricle) or both (left and right) ventricles during diastole. Diastole is the cardiac cycle phase during which the heart is relaxing and filling with incoming blood. . . ." http://encyclopedia.thefreedictionary.com/diastolic+dysfunction.     Diastolic dysfunction is measured using an echocardiograph. *Id.*

prescribed treatments in finding him capable of sedentary work despite his impairments. (*Id.*).

Plaintiff has pointed to records containing some notations regarding specific conditions that the ALJ does not expressly mention, such as notes from Dr. Soriano that he had anemia in May 2011 with no symptoms, or notes from Dr. Hasan that his aortic stenosis was stable on medication in October 2011. (R. 259; 548). These records and the others that Plaintiff cites only discuss conditions which his physicians state are under control with treatment or cause no abnormalities, and therefore do not reflect any limitations that the ALJ failed to consider. And the ALJ, although he did not expressly discuss the specific conditions noted in these physician reports, did expressly rely on the doctors' overall conclusions that Plaintiff was doing well during these times. (R. 52-54). Therefore, Plaintiff has not shown any error.

### 3. Mental Limitations

Finally, Plaintiff argues that the ALJ erred by failing to include any mental limitations in the RFC determination, specifically from his anxiety and any related shortness of breath which he asserts "may affect his ability to sustain a normal work day and week[.]" (Doc. 15, at 10; Doc. 24, at 4). Plaintiff notes that although the ALJ found his anxiety was non-severe, the ALJ was still obliged to consider it in making the RFC determination. (*Id.*). The ALJ's decision shows he complied with this requirement, as he expressly discussed Plaintiff's complaints of anxiety, panic attacks, feelings of heart racing from stress, and use of medications such as Xanax to treat his anxiety. (R. 51-54). The ALJ explained that he found Plaintiff's anxiety was not as severe as he alleged based on the medical record, including the reports of his own doctors that his anxiety

was triggered by stressful events such as his February 2011 car accident, the consultative examiner's finding that his blood pressure was generally controlled despite his anxious appearance, and the evidence that he had normal lung functioning and a lack of sustained tachycardia. (R. 52-53). Substantial evidence supports the ALJ's determination not to add mental limitations to Plaintiff's RFC based on the evidence.

Plaintiff argues that the ALJ's mental RFC determination is undermined by the September 4, 2012 opinion of his psychiatrist, Dr. Anwar, that he has a depressive disorder which caused major impairments. He further asserts that this opinion was given little weight by the ALJ for insufficient reasons. A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ, 20 C.F.R. § 404.1527(c)(2)-(5). *See, e.g., Simila*, 573 F.3d at 515.

The ALJ's analysis of Dr. Anwar's opinion provides a sound explanation for giving the opinion little rather than controlling weight, and his determination is supported by substantial evidence. The ALJ explained that Dr. Anwar's opinion "contrasts sharply

with the other evidence of record" and the psychiatrist cited no support for his opinion. (R. 55). Plaintiff argues that the opinion is consistent with the record since it contains his complaints to his physicians of anxiety and emotional behavior, but as the ALJ found there are no treatment notes suggesting severe or major impairments from these issues, and Dr. Anwar provides no support for his findings. In giving the opinion little weight, the ALJ also noted that the psychiatrist had only been treating Plaintiff since July 2012 when he gave his opinion (45 days later), and had only seen him two times. Contrary to Plaintiff's position that these issues are irrelevant to the weighing of Dr. Anwar's opinion, the length of the relationship and frequency of examination are factors the regulations provide should be considered by the ALJ, along with the support given for the opinion and consistency with the record. Plaintiff has not shown any error in the ALJ's analysis of Dr. Anwar's opinion.

## C. Credibility Determination

Plaintiff next argues that the ALJ erred in making his credibility determination by failing to follow the requirements of SSR 96-7p, since he did not sufficiently articulate the weight given to Plaintiff's testimony, the reasons for that weight, and "gloss[ed] over" evidence that contradicted the ALJ's credibility finding. (Doc. 15, at 11-12; Doc. 24, at 4). SSR 96-7p requires an ALJ to give "specific reasons for the finding on credibility, supported by the evidence in the case record" that are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 WL 374186, at *4. In making the determination, the ALJ must consider the objective medical evidence, the claimant's daily activities, his pain or other symptoms, any medication usage, any

treatment other than medication, and any other factors relevant to a claimant's functional limitations and restrictions. *Id.* at *3. In this case, the ALJ sufficiently articulated his credibility finding with reasons that are supported by substantial evidence.

The ALJ explained that "[t]o the extent that [Plaintiff's] testimony and presentation at the hearing are construed to indicate he is not capable of performing even sedentary work, his testimony and presentation cannot be considered fully credible." (R. 54). In support, he noted that Plaintiff had surgery for his cardiac condition, which suggests genuine symptoms, but this is "offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms." (R. 54). As noted above in this opinion, the ALJ provided numerous examples from the record in support of this determination, including the post-operative medical findings from the physicians of record, the normal February 28, 2012 Doppler ultrasound, and his improved ejection fraction in the echocardiograph results. (R. 52-54). In addition to the medical evidence, the ALJ also notes that Plaintiff's treatment history since his surgery has been "essentially routine and/or conservative in nature" which undermines his allegations of "persistent symptoms since the surgery[.]" (R. 54). This is supported by citations to the record of Plaintiff's treatments with medications and the lack of shock treatment from his defibrillator. (R. 52-53). The ALJ also relied on numerous instances in which Plaintiff reported to his physicians that he was doing well and denied significant symptoms. (*Id.*).

The evidence also does not support Plaintiff's assertion that there was contradictory evidence throughout the record that the ALJ "gloss[ed] over." He cites as

an example the notation in his February 2011 hospitalization records that he experienced "persistent anxiety." (R. 280). This note, however, described his complaint of feeling anxious and stress after his car accident for the day of the accident, not any long-term symptoms. (*Id.*). Moreover, the ALJ noted this comment in the decision, but also accurately noted that there were no findings of shortness of breath or other abnormalities upon Plaintiff's examination at the hospital; that his anxiety was attributed to the accident by his doctors; and that the doctors found no evidence of heart failure and improvement in his ejection fraction while he was hospitalized. (R. 52).

As another example, Plaintiff cites his complaints of chest pain during Dr. Voss's consultative examination that the ALJ did not expressly note. Nevertheless, the ALJ did note Plaintiff's repeated denials of chest pain in four examinations thereafter on October 27, 2011, November 30, 2011, March 14, 2012, and June 1, 2012. (R. 53). The ALJ also relied on his physicians' findings of a lack of cardiac conditions, lung problems, or other symptoms related to his chest on those same dates, and from an additional June 15, 2012 examination. (*Id.*). In short, none of the examples Plaintiff provides undermine the ALJ's credibility determination, which does not require reversal.

## D.    Step Five Application of Grids

Finally, Plaintiff argues the ALJ erred using the grids at Step Five to find him not disabled based on the RFC determination that he can perform the full range of sedentary work. (Doc. 15, at 12-13). When a claimant has only exertional limitations—that is, limitations in their ability to sit, stand, walk and lift—then "an ALJ may rely on the grids to determine whether a person is disabled." *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014) (citing *McKinzey*, 641 F.3d at 892). The ALJ may not rely on the grids if

a claimant has non-exertional limitations in addition to their exertional limitations, such as mental or other limitations. *See id.*

Plaintiff concedes, given his characteristics and the RFC found by the ALJ, that the grids direct a finding that he is not disabled. (Doc. 15, at 12). He argues, however, that the ALJ made the incorrect RFC determination and should have found non-exertional limitations based on, for example, his depressive disorder, anxiety, racing heart, and shortness of breath. Therefore, he asserts, the grids should not have been used in this case. However, as the Court explained above, Plaintiff has not shown that the ALJ erred in his RFC determination, and therefore has not shown any error in the ALJ's application of the grids in this case.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security [Doc. 14] is denied and Defendant's Motion for Summary Judgment [Doc. 22] is granted. Judgment will be entered in favor of Defendant.

ENTER:

Dated: July 9, 2015

SHEILA FINNEGAN
United States Magistrate Judge